UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**MIAMI DIVISION**

**CASE NO. 23-24395-CIV-WILLIAMS/GOODMAN**

JOHN JOSEPH CONNOLLY,

       Petitioner,

v.

RICKY D. DIXON, SECRETARY,
FLORIDA DEPARTMENT OF CORRECTIONS,

       Respondent.

_____/

**REPORT AND RECOMMENDATIONS**
**ON PETITIONER'S HABEAS CORPUS PETITION**

## I.    Introduction

A former Federal Bureau of Investigation ("FBI") Special Agent, John Joseph Connolly ("Connolly") filed a federal court habeas corpus petition [ECF No. 1] challenging the constitutionality of his state conviction (for second-degree murder with a firearm) and sentence because (he alleges) the State of Florida intentionally suppressed exculpatory evidence before his criminal trial. A state court evidentiary hearing on Connolly's state motion for post-conviction relief focused on a previously undisclosed email which another FBI special agent sent state prosecutors two years before Connolly's trial. The trial court judge presiding over the evidentiary hearing was frustrated over prosecutors' decision to not produce the email, and he found that the failure to disclose

it constituted a *Brady*[1] violation and that the failure to do so "appears to have been deliberate and intentional."[2]

Nevertheless, the state court judge denied Connolly relief for the *Brady* violation, concluding that it "lacked materiality, in that there was no reasonable probability that, had it been disclosed, the outcome of the trial would have been different." (R. 996). The Third District Court of Appeal affirmed the "not material" conclusion, and the Florida Supreme Court denied a petition for further review, prompting Connolly's federal habeas corpus petition.

Connolly was released from state prison on February 19, 2021 on Conditional Medical Release. Both Connolly and Respondent agree he still meets the "in custody" requirement necessary to invoke our Court's jurisdiction over his habeas petition (because he is subject to special release conditions, such as remaining confined to his approved residence or an approved medical facility). *Clements v. Fla.*, 59 F.4th 1204, 1206 (11th Cir. 2023) (defining custody to mean physical detention or confinement and highlighting how "certain restraints on a person's liberty, short of physical detention, can satisfy the 'in custody' requirement").

---

[1]     *Brady v. Maryland*, 373 U.S. 83 (1963).

[2]     The appellate court did not seem to view the violation with the same reaction. In fact, it described as "persuasive" the State's position that the record contained no evidence of an *intentional* violation concerning the withheld e-mail. *See Connolly v. State,* 366 So. 3d 1142, 1150 (Fla. 3d DCA 2023).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs Connolly's petition. Unfortunately for Connolly, AEDPA *greatly* circumscribes federal habeas review of final state court decisions and, in practice, means that the standard generates a formidable barrier to relief which is both mandatory and difficult to meet. *White v. Woodall*, 572 U.S. 415, 419, 134 S. Ct. 1697, 188 L. Ed. 2d 698 (2014).

In fact, the United States Supreme Court has candidly acknowledged that the applicable AEDPA standard was *intended* to be "difficult to meet" and that a petitioner like Connolly must prove that the state court's ruling "was so lacking in justification" that it contained "an error well understood and comprehended in existing law beyond *any* possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) (emphasis added). The AEDPA standard is so substantial that a court's authority to issue a writ of habeas corpus exists only in exceedingly rare cases because habeas corpus is a guard "against **extreme** malfunctions in the state criminal justice systems," and is "not a substitute for *ordinary error* correction through appeal." *Id. (*emphasis added).

Therefore, notwithstanding the undisputed existence of an intentional[3] *Brady* violation here, the legal hurdles erected by AEDPA are too significant for Connolly to

---

[3] The trial judge found that the *Brady* violation appears to have been intentional, but the appellate court indicated that the State's argument of an unintentional violation was persuasive. The Undersigned will *assume,* without deciding, that the *Brady* violation was, in fact, intentional. That is because my Report and Recommendations ruling remains the same under both views.

clear with the arguments raised in his Petition. Thus, the Undersigned **respectfully recommends** that United States District Judge Kathleen M. Williams **deny** the Petition and also **not** issue a certificate of appealability.

## II.     Procedural and Factual Background

The factual background is largely based on the procedural history, which is detailed, lengthy and comparatively complex. In his Opposition to this habeas petition, Respondent provided a comprehensive procedural history, much of it coming directly from the state appellate court's opinion affirming the conviction and sentence, the arguments Connolly raised in myriad post-trial briefs, a post-conviction evidentiary hearing transcript, and the trial court's ruling. The factual backdrop for the instant habeas motion comes largely from these sources.

Petitioner and his three co-defendants -- James J. Bulger ("Bulger"), Stephen J. Flemmi ("Flemmi"), and John V. Martorano ("Martorano") -- were charged by Indictment with first-degree premeditated murder (Count I) and conspiracy to commit first-degree murder (Count II). (Ex. A & B, App. pp. 1–8, DE 22-1: 1–8).[4] Both Flemmi and Martorano

---

[4]      Respondent's first attempt at submitting exhibits was confusing and difficult for a reader to review. The Undersigned issued an Order [ECF No. 33], requiring the submission of a more-detailed index to the exhibits (and a separate description, with page numbers, for the exhibits. The Order also required Respondent to file a revised version of the response brief, with accurate and easy-to-understand citations to trial transcripts and/or supplemental exhibits. Respondent filed a response to this Order, and also submitted the more-detailed index and the revised brief. [ECF Nos. 34; 36; 37]. As mandated by the Order, Respondent explained that the revised response brief "does not contain any substantive changes whatsoever" and that the "only purpose" (other than

pled guilty to the lesser offense of murder in the second degree, and they agreed to testify on behalf of the State against Petitioner and Bulger, who was still a fugitive at the time. Petitioner was tried independently, and the jury convicted him of second-degree murder with a firearm, as a lesser-included offense of first-degree murder, and was sentenced to forty years in State prison.

The second-degree murder conviction was reclassified from a first-degree felony to a life felony, pursuant to section 775.087(1), Florida Statutes (1981), based on the jury's specific finding that Petitioner carried a firearm during the acts he committed as a principal to the murder. *Connolly v. State,* 172 So. 3d 893, 897–98 (Fla. 3d DCA 2015); (Ex. N, App. pp. 838–39, DE 22-7: 42–43); (Ex. P, App. pp. 842–45, DE 22-7: 46–49). (Ex. W, App. pp. 924–26, DE 22-7: 128–130).

Petitioner filed a direct appeal with Florida's Third District Court of Appeal, case No. 3D09-280, in which he raised five arguments. None of them involved the *Brady* issue on which this federal habeas petition is based. [Of course, Petitioner was not aware of the 2006 email underlying the *Brady* issue until many additional years had passed -- January 17, 2018].

On July 29, 2015, after oral argument *en banc* on the State's Motion for Rehearing/Rehearing *En Banc*, the appellate court issued a detailed *en banc* decision

---

complying with the Order) was to "provide more detailed citations to the supplemental exhibits, pursuant to the Court's Orders." [ECF No. 37, p. 1, n.1].

5

affirming the judgment and sentencing decision. (Ex. CC, App. pp. 1114–23, DE 22-8: 155–164); (Ex. DD, App. pp. 1124–42, DE 22-8: 165-183); (Ex. EE, App. pp. 1143–62, DE 22-8: 184–203); (Ex. FF, App. pp. 1163–1223, DE 22-8: 204–64); (Ex. GG, App. pp. 1224–85, DE 22-8: 265–66); (Ex. HH, App. pp. 1286–99, DE 22-8: 327–DE 22-9: 1–13); (Ex. II, App. pp. 1300–19, DE 22-9: 14–33).

The appellate court's majority opinion contains the following "Summary of the Case," which sets forth a detailed recitation of the facts surrounding the subject murder, which occurred while Petitioner was working as an FBI special agent in Boston, Massachusetts, and had a corrupt relationship with two members of a violent organized crime group in Boston, Bulger and Flemmi:

> The 2005 indictment charged the defendant and his co-defendants in Count I as follows:
>
> ### Count I
>
> > [T]hat on or between the 31st day of July, 1982, and the 2nd day of August, 1982, within the Counties of Miami–Dade and Broward, State of Florida, JAMES J. BULGER, STEPHEN J. FLEMMI, JOHN V. MARTORANO and JOHN J. CONNOLLY, JR., did unlawfully and feloniously kill a human being, to wit: JOHN B. CALLAHAN, from a premeditated design to effect the death of the person killed or any human being, by shooting the said JOHN B. CALLAHAN with a firearm, in violation of s. 782.04(1), s. 775.087 and s. 777.011, Florida Statutes, to the evil example of all others in like cases offending and against the peace and dignity of the State of Florida.
>
> To understand the murder of John B. Callahan ("Callahan") and the defendant's involvement in Callahan's murder, a summary of the evidence

established at trial is necessary. The evidence at trial revealed that Callahan's murder was the last of several murders committed by and/or for the benefit of James "Whitey" Bulger, Stephen Flemmi, John Martorano, and the Winter Hill Gang, an organized crime organization working out of Boston, Massachusetts. The chain of events that led to Callahan's murder began in 1973.

In 1973, the defendant, an agent working for the Federal Bureau of Investigation ("FBI"), was transferred to the Boston office of the FBI where he was assigned to the organized crime division. In 1975, the defendant recruited Bulger and Flemmi to work as FBI informants, and over time, the defendant became corrupted by his relationship with Bulger, Flemmi, and the Winter Hill Gang. Although he provided some of the information he obtained from Bulger and Flemmi to the FBI, the defendant also submitted false and misleading information and reports to the FBI to protect Bulger and Flemmi, and he provided Bulger and Flemmi with confidential FBI and law enforcement information, which enabled Bulger and Flemmi to avoid arrest and prosecution by federal, state, and local law enforcement.

Flemmi testified that the defendant was considered a member of their criminal organization and that he was essentially on their payroll. In exchange for the defendant's services (providing misleading and false information to the FBI and giving Bulger and Flemmi confidential law enforcement information), the defendant was paid large sums of money. Bulger and Flemmi also used the defendant as a conduit for the delivery of cash and gifts from Bulger and Flemmi to other FBI agents. Thus, the defendant was working both sides and profiting from each. He benefited professionally by providing organized crime information to the FBI, and he benefited personally and financially by assisting Bulger and Flemmi.

The jury learned about some of the confidential information the defendant provided to Bulger and Flemmi. For example, in 1976, the defendant warned Bulger and Flemmi that Richard Castucci, another FBI confidential informant, had given the FBI the location of two Winter Hill Gang members who were federal fugitives. Based on the information provided to them by the defendant, Bulger and Flemmi warned the two fugitives, and they, along with Martorano, murdered Castucci for his disclosures to the FBI. In 1978, the defendant also warned Bulger and Flemmi that they were about to be indicted in a federal racketeering case, but the defendant told them that if they agreed not to kill Anthony "Tony" Ciulla, who was cooperating

with the government as a witness against members of their criminal organization, Bulger and Flemmi would not be indicted. Additionally, the defendant warned Bulger and Flemmi that Martorano was going to be indicted. As a result, Martorano went into hiding in Miami.

In 1978, Callahan, the victim in the instant case, was the owner and president of World Jai Alai. When Callahan learned that the authorities in Connecticut had discovered his ties to the Winter Hill Gang and other organized crime figures in Boston, he sold World Jai Alai to Roger Wheeler ("Wheeler"). Four years later, when Callahan decided that he wanted to repurchase World Jai Alai from Wheeler, but Wheeler refused to sell, Callahan solicited Bulger, Flemmi, and Martorano to murder Wheeler. On May 27, 1981, Martorano shot and killed Wheeler at a country club in Tulsa, Oklahoma.

During its investigation of the Wheeler murder, the FBI began searching for members of the Winter Hill Gang to cooperate with the FBI. Brian Halloran ("Halloran"), a member of the Winter Hill Gang who had been indicted for an unrelated murder in Boston, agreed to cooperate with the FBI in the Wheeler murder investigation in order to obtain leniency in his pending case.

When the defendant learned from his supervisor, Special Agent John Morris, that Halloran was cooperating with the FBI and that Halloran had implicated Bulger and Flemmi in the Wheeler murder, the defendant warned Bulger and Flemmi. After this initial warning, the defendant contacted Bulger and Flemmi again to warn them that the FBI had outfitted Halloran with a body wire and had directed Halloran to meet with Callahan. After being alerted by the defendant, Bulger and Flemmi warned Callahan that Halloran intended to inform on him, and Bulger, with the help of other Winter Hill Gang members, murdered Halloran.

Because the Halloran murder was committed on a public street in Boston, the investigation intensified. In an effort to deflect suspicion away from Bulger, Flemmi, and the Winter Hill Gang, the defendant prepared and submitted a series of false reports suggesting that other organized crime factions in Boston were responsible for Halloran's murder. Despite the defendant's efforts, the FBI continued to believe that Bulger and Flemmi were involved in the Wheeler and Halloran murders, and its investigation focused on locating Callahan to obtain his cooperation. When the defendant

learned that the FBI was looking for Callahan, the defendant contacted Bulger and Flemmi and told them that Callahan would likely cooperate and implicate Bulger, Flemmi, and Martorano in the Wheeler murder, and the defendant suggested that they contact their hit man, Martorano, to "handle it" so none of them would be caught.

Thereafter, Bulger and Flemmi met with Martorano, informed him what the defendant had told them, and Martorano agreed to kill Callahan before the FBI could locate him, specifically agreeing to kill Callahan in Florida because of the "heat on them" in Boston. After meeting with Martorano, Bulger and Flemmi met with the defendant and told the defendant that Martorano and his associate, Joe MacDonald, were going to "take care of" Callahan. Flemmi testified that the defendant clearly knew that "tak[ing] care of" Callahan meant they were going to have Callahan killed based on the information the defendant had given them—that the FBI would find Callahan, who would likely cooperate with the FBI and implicate Bulger, Flemmi, and Martorano in Wheeler's murder. On July 31, 1982, Martorano met Callahan at the Fort Lauderdale Airport, shot Callahan in the back of the head, put Callahan in the trunk of a car, and left the car and body at the Miami International Airport.

In anticipation of Callahan's murder, the defendant filed false reports with the FBI in an effort to mislead the FBI and to protect Bulger and Flemmi. In these reports, the defendant provided alibis for Flemmi and Bulger for both the Halloran murder and the planned Callahan murder, and the defendant also falsely reported that Callahan had a falling-out with a group of Cuban drug dealers in Miami in order to deflect the FBI's attention away from Flemmi, Bulger, and Martorano.

After Callahan was murdered, the FBI and other law enforcement agencies redoubled their efforts into the investigation, and the defendant continued to manipulate the system to protect Bulger, Flemmi, and himself. However, in 1990, after the defendant had retired from the FBI, Bulger and Flemmi became the subjects of a federal grand jury investigation. The defendant, who had maintained his relationship with other FBI agents, kept Bulger and Flemmi informed as to the progress being made in the FBI's investigation of Bulger and Flemmi, and, when the defendant learned Bulger and Flemmi were about to be indicted by the federal grand jury and arrested, he warned them. Bulger went into hiding, while Flemmi, who did not react quickly enough, was arrested.

> After Flemmi was arrested, the defendant wrote a letter to the presiding federal judge in an effort to have Flemmi's case dismissed. Many of the statements he made in this letter were false. The defendant also provided sensitive FBI information and documents to Flemmi's defense attorney, and he counseled Flemmi to falsely testify that the defendant's supervisor, Special Agent Morris, warned Bulger about the federal indictment rather than the defendant. Ultimately, however, Flemmi and others agreed to cooperate with the FBI and other law enforcement agencies, and an amended indictment was filed in 1995 charging the defendant, along with the previously-charged co-defendants (Bulger, Flemmi, and Martorano), with Callahan's murder. The defendant was tried, and on November 6, 2008, the jury found the defendant guilty of the reclassified lesser included offense of second[-]degree murder with a firearm.

*Connolly*, 172 So. 3d at 898–901.

> The majority opinion made the following additional points:

> The defendant does not dispute the sufficiency of the evidence relied on by the jury in finding him guilty of second[-]degree murder, nor does he dispute that he carried a firearm on his person during the acts he committed as a principal to the murder. The evidence as to both his participation in the murder and his possession of a firearm during his participation is overwhelming. Rather, the defendant disputes the legality of the reclassification of the second[-]degree murder from a first degree felony to a life felony even though the reclassification was based on his actual possession of a firearm. The reclassification issue is dispositive, as it is undisputed that the indictment was filed in 2005 and the homicide was committed in 1982. Thus, without the reclassification from a first[-]degree felony to a life felony, the defendant's conviction must be vacated due to the expiration of the four-year statute of limitations for first degree felonies pursuant to the law that was in effect in 1982. § 775.15(2)(a), Fla. Stat. (1981).

*Id*. at 898 (footnote omitted).

> The Court's majority opinion concluded that the reclassification of the second-degree murder charge was based on Petitioner's personal possession of a firearm during

10

the commission of the homicide, not on the vicarious possession of a firearm by a co-defendant. It also pointed out that "there was abundant evidence [he] personally carried a firearm during the commission of the homicide." *Id*.

Petitioner then sought discretionary review in the Florida Supreme Court, Case No. SC15-1585, based on direct and express conflict. On January 19, 2016, the Florida Supreme Court denied the petition for review. *Connolly v. State*, No. SC15-1585, 2016 WL 224185 (Fla. Jan. 19, 2016).

On October 24, 2016, Petitioner filed a Petition for Writ of Habeas Corpus with Florida's Third District Court of Appeal, Case No. 3D16-2388, in which he raised an ineffective assistance of counsel claim based on his attorney's failure to argue on appeal that the trial court erred by instructing the jury as to the lesser-included offense of second-degree murder. (Ex. AAA, App. pp. 1642–68, DE 22-9: 356–82). The State filed a Response, and Petitioner filed a Reply. (Ex. BBB, App. pp. 1669–87, DE 22-9: 383–401); (Ex. CCC, App. pp. 1688–1707, DE 22-9: 402–03–DE 22-10: 1–18).

The appellate court denied the Petition on February 6, 2019, as well as Petitioner's motion for rehearing. (Ex. DDD, App. pp. 1708–15, DE 22-10: 19-26); (Ex. EEE, App. pp. 1716–27, DE 22-10: 27–38); (Ex. FFF, App. pp. 1728–34, DE 22-10: 39–45); (Ex. GGG, App. pp. 1735–42, DE 22-10: 46–52); *Connolly v. State*, 288 So. 3d 638 (Fla. 3d DCA 2019). Petitioner sought review in the Supreme Court of the United States, Case No. 19-6161, which was denied. *Connolly v. Fla.*, 140 S. Ct. 648 (2019).

On January 17, 2017, counsel for Petitioner filed a Motion for Post-Conviction Relief in which he raised the following claims (among others):[5]

     II.     BUT FOR DEFENSE COUNSEL'S FAILURE TO INVESTIGATE AGENT FITZPATRICK, MR. CONNOLLY'S CONVICTION WOULD HAVE BEEN VACATED.

     III.     MR. CONNOLLY'S DUE PROCESS RIGHTS WERE VIOLATED WHEN THE STATE WITHHELD EXCULPATORY EVIDENCE IN VIOLATION OF *BRADY V. MARYLAND*.

          A.     The State Possessed Evidence That was Favorable to Mr. Connolly Because It Was Exculpatory.

          B.     The State Willfully or Inadvertently Suppressed the Exculpatory Evidence.

          C.     Mr. Connolly was Prejudiced by the State's Failure to Disclose the Exculpatory Evidence Because if the Evidence Had Been Disclosed to the Defense, There is a Reasonable Probability that the Result of the Proceeding Would Have Been Different.

(Ex. HHH, App. pp. 1743–78, DE 22-10: 54–89).

On April 21, 2017, the State filed its (Initial) Response to the Defendant's Motion for Post Conviction Relief. (Ex. III, App. pp. 1779–1801, DE 22-10: 90–112). Thereafter, Petitioner filed a Reply to State's Response to Motion for Postconviction Relief. (Ex. JJJ, App. pp. 1802–17, DE 22-10: 113–28). At a hearing on or about January 17, 2018, the trial court granted an evidentiary hearing on the *Brady* claim set forth in the third issue of Petitioner's motion, and summarily denied the remaining claims. (Ex. MMM, App. pp.

---

[5]     The Undersigned is omitting arguments unconnected to the *Brady* issue raised in the instant habeas petition.

2316–34, DE 22-10: 627–45).

The evidentiary hearing took place on January 13, 2021. (Ex. KKK, App. pp. 1818–2104, DE 22-10: 129–415). After the evidentiary hearing, on January 21, 2021, Petitioner filed a Motion for Leave to File Closing Memorandum of Law and Attached Memo of Law. (Ex. QQQ, App. pp. 2358–67, DE 22-10: 669–78). On January 28, 2021, the State filed its Reply to the Defendant's Memo of Law Filed January 21, 2021 and Attachments. (Ex. RRR, App. pp. 2368–70, DE 22-10: 679–981). On February 3, 2021, Petitioner filed a Reply to the State's Response to Defendant's Memo of Law. (R. SSS, App. pp. 2671–78, DE 22-10: 982–89).

On April 13, 2021, the trial court entered an Order Denying Motion for Postconviction Relief. (Ex. TTT, App. pp. 2679–98, DE 22-10: 990–1009). [**Note**: As reflected in the footnote immediately preceding this discussion, only the second and third issues are pertinent to the subject Petition].

As to the second issue regarding a claim of ineffective assistance of counsel for failure to investigate Agent Robert Fitzpatrick, Petitioner's supervisor, the court noted that the discovery contained various statements by Agent Fitzpatrick which were inconsistent with the statement contained in Fitzpatrick's December 3, 2013 Affidavit. The Order went on to state that "after testifying in the trial of James 'Whitey' Bulger, Agent Fitzpatrick was charged and ultimately convicted of obstruction of justice and perjury. Even if the Court finds that trial counsel was deficient for failing to depose Agent

13

Fitzpatrick, Defendant fails to establish prejudice as a result of this failure. The Court cannot find that the failure to depose Agent Fitzpatrick, or rather to call him as a defense witness, in light of all of the statements he had previously made, would have changed the outcome of the trial." (Ex. TTT, App. p. 2683, DE 22-10: 994).

Although the claim was previously summarily denied, the court noted that the evidentiary hearing on the motion's third issue revealed *more* evidence in support of the denial of the second issue. *Id.*

The third issue in Petitioner's motion alleged that the State withheld exculpatory evidence in violation of *Brady*, which resulted in a violation of Petitioner's due process rights. Petitioner's motion included an affidavit from former Agent Fitzpatrick, dated December 3, 2013, which claimed that at some time between 2006 and September 2008, he told Special Agent James Marra, Office of the Inspector General, U.S. Department of Justice, that only a few people knew of the Callahan investigation, and that Petitioner was not one of them. Petitioner alleged that the State knew about this statement, but failed to disclose it, and that such failure constitutes a *Brady* violation. (Ex. TTT, App. pp. 2679–98, DE 22-10: 990–1009).

On or about January 17, 2018, at a hearing to determine whether Petitioner was entitled to an evidentiary hearing on any of the issues raised in the motion, the State acknowledged the existence of a pre-trial email dated July 6, 2006, from Special Agent Marra to Assistant State Attorney Michael Von Zamft and Assistant U.S. Attorney Fred

Wyshak. The email was then provided to the court and the defense. (Ex. MMM, App. p. 2319, DE 22-10: 630).

The court found that the State's failure to disclose the email prior to trial appeared to have been deliberate and intentional and constituted a *Brady* violation. However, because the email lacked materiality, *i.e.*, there was no reasonable probability that, had it been disclosed, the outcome of the trial would have been different, the court denied the claim. (Ex. TTT, App. pp. 2679–98, DE 22-10: 990–1009).

Petitioner then appealed the trial court's April 13, 2021, Order Denying Motion for Postconviction Relief to Florida's Third District Court of Appeal, Case No. 3D21-1111, in which he raised the following *Brady* issues:[6]

I.  THE STATE INTENTIONALLY AND DELIBERATELY WITHHELD INFORMATION THAT WAS MATERIAL AND PREJUDICIAL, REQUIRING A NEW TRIAL.

   A.  If the State Had Not Committed the Brady Violation, More Evidence Would Have Been Discovered in Light of the Email.

   B.  The Intentionally and Deliberately Suppressed Exculpatory Email and Subsequent Investigation Could Reasonably Be Taken to Put The Whole Case in Such A Different Light as to Undermine The Confidence In The Verdict.

      1.  The Underlying Trial Conviction Is Already Weak.

      2.  The Evidence Must Be Viewed Cumulatively.

----

[6]  The Undersigned is not discussing the non-*Brady* arguments, as they are not the basis of Connolly's habeas petition here.

      C.     To Let the State Commit Such A Violation in Bad Faith Without Consequence Would Be an Erosion of Brady and the Constitutional Rights Therein.

            1.     A *Brady* Violation is Never Harmless Error.

            2.     Whether Fitzpatrick's Testimony Email Would Not Have Been Believable to a Jury in Light of His Other Statements Is Not a Question of Law but a Question of Fact for a Jury to Decide.

(Ex. VVV, App. pp. 2702–63, DE 22-10: 1013–74).

Respondent filed an Answer Brief and Petitioner filed a Reply Brief.

On April 12, 2023, the state appellate court issued a lengthy opinion which addressed the *Brady* claim and summarily affirmed the remaining grounds. *Connolly v. State*, 366 So. 3d 1142 (Fla. 3d DCA 2023). As to the *Brady* claim, the opinion ultimately found that Petitioner failed to establish a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Counsel for Petitioner filed a Motion for Rehearing, Motion for Rehearing *En Banc*, and Motion for Certification. Respondent then filed a Response to Defendant's Motion for Rehearing, Certification, and Request that the Court Issue a Written Opinion. On June 30, 2023, the state appellate court denied Petitioner's motion.

Petitioner then filed a Notice to Invoke Discretionary Jurisdiction in the Florida Supreme Court, Case No. SC23-1030. Both parties filed briefs on jurisdiction. On November 16, 2023, the Florida Supreme Court denied the request for further appellate review.

16

On November 17, 2023, counsel for Petitioner filed the instant Petition for Writ of Habeas Corpus by a Person in State Custody, in which he raised the following claim and sub-claims:

GROUND I. THE STATE'S INTENTIONAL WITHHOLDING OF PREJUDICIAL INFORMATION DEPRIVED MR. CONNOLLY OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL, IN VIOLATION OF 28 U.S.C. § 2254(d)(1) AND THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

I.   The State Court's Opinion Resulted in a Decision that is an Unreasonable Application of *Brady v. Maryland.*

II.  The State Court Unreasonably Determined an Inadmissible Affidavit was Relevant to Mr. Connolly's *Brady* Claim.

III. The State Court Erroneously Concluded Mr. Connolly had Equal Access to Information Contained in the Suppressed Evidence and Unreasonably Conflated the Prongs of its *Brady* Analysis.

[ECF No. 1].

Respondent filed a substantive Opposition[7] and Petitioner filed a Reply [ECF Nos. 21; 24]. The Undersigned also issued an Order [ECF No. 32] denying Petitioner's Second Request for Court to Take Judicial Notice [ECF No. 27] (of a state court order, in an unrelated case, which was entered years after the State Court -- on both the trial and appellate levels -- adjudicated Petitioner's habeas claims on the merits).

---

[7]   As explained earlier in this ruling, Respondent also filed a Court-ordered revised response to improve the record citation format. [ECF No. 37].

**Petitioner's Contentions (and Facts Relating to Them)**

Petitioner's arguments are based on his contention that he could not have tipped off Bulger and Flemmi that the FBI was looking for Callahan to pressure him into cooperating because he "would not have had access to the information that was disclosed" -- given that: (1) he was a full-time graduate student at Harvard during the leaks to Bulger and Flemmi; and (2) he was "walled off" from the purportedly disclosed information. [ECF No. 1, p. 3]. Although the jury heard from several State witnesses, Petitioner notes, it never heard from Special Agent Robert Fitzpatrick, who Petitioner describes as an "unbiased" FBI agent "with exculpatory evidence." *Id.*

According to Petitioner, Fitzpatrick was the Assistant Special Agent in Charge ("ASAC") of the FBI's Boston office during the time relevant to Connolly's prosecution, and was in charge of the Organized Crime Division. Petitioner says that Fitzpatrick also supervised the investigation into Callahan's murder.

Petitioner argues that Fitzpatrick was "in the position to know which agents were privy to information." *Id.* at 4.

Petitioner's state motion for post-conviction relief attached an affidavit from Fitzpatrick, and it explained what Fitzpatrick supposedly told Special Agent Marra -- the lead investigator into Callahan's murder -- at a meeting outside a Boston courtroom:

> I recall telling agent James Marra that based on my hands-on, direct knowledge of our FBI investigation which was ongoing from January 1982, it was clear that former FBI agent John Connolly, who was away in Cambridge[,] Massachusetts pursuing a Masters degree at Harvard's

> Kennedy School of Government at the time (September 1981 to June 1982), would not have been in any position to have knowledge of my secret plan to "turn" John Callahan as an informant against   James   Bulger,   Stephen Flemmi[,] and John Martorano.

(Ex. HHH, App. p. 1771, DE 22-10: 82).

Fitzpatrick also stated that Connolly "could not have possessed the requisite knowledge" necessary "to provide any 'tip' which led to the murder of John Callahan." (Ex. HHH, App. p. 1772, DE 22-10: 83). According to Fitzpatrick, only John Morris, another FBI special agent who supposedly did have access to this information, had the "necessary motive, means and opportunity to have leaked information to James Bulger which resulted in the murder of John Callahan." (Ex. HHH, App. p. 1773, DE 22-10: 84). Petitioner stresses that Morris received immunity for providing testimony against him and was able to keep his FBI pension benefits.

After recieving Petitioner's motion and Fitzpatrick's affidavit, state prosecutors produced a previously-undisclosed email which Marra had sent to prosecutors in 2006, two years before Petitioner's trial. The email said that Fitzpatrick: (1) called Marra and said that Connolly was not responsible for Callahan's murder; (2) believed the State's incentivized witnesses -- associates of the Winter Hill Gang -- were lying; and (3) never heard that Connolly was leaking information, but he had heard that other agents in the office were leaking information to the Winter Hill Gang.

This email is quoted below, in its entirety:

Fred/Mike:

Bob Fitzpatrick voluntarily called me this afternoon. Bob stated that he may have a potential terrorist financing matter that needs federal investigation. I referred Fitzpatrick to the FBI and/or ICE. He stated that he would call FBI SAC Ken Kaiser directly.

Fitzpatrick also stated that it was his personal "opinion" that John Connolly was not responsible for the Holloran [sic] and Callahan murders. However, he offered no specific information to support his opinion and agreed that he was not privy to all the evidence in the Connolly murder prosecution case in Florida. Fitzpatrick added that he has no information that Connolly did or did not reveal FBI informant identities to Bulger/Flemmi.

Fitzpatrick stated that he never heard that Connolly was leaking information while he was ASAC (approximately 1/81 – 9/86) in Boston. In contrast, while serving as ASAC and later as SA (9/86 – 12/ 86) he did hear that SAC Ahearn and SA Hargraves were leaking information. Fitzpatrick added that Hargraves was never properly investigated by the FBI.

Fitzpatrick stated that he did not believe that Flemmi or [Kevin] Weeks were telling the truth about Connolly. Fitzpatrick stated that he would re-contact me if he recalled anything specific that would exonerate Connolly.

I informed Fitzpatrick that he may be a potential witness for the government or defense in the Connolly murder  prosecution in Florida.

Jim.

(Ex. MMM, App. p. 2319, DE 22-10: 630).

As noted, the state prosecutors never produced this email to the defense before trial, nor did they provide the information about Fitzpatrick's purported beliefs about Connolly's innocence. Both of Petitioner's trial lawyers say they would have taken

Fitzpatrick's deposition and called him as a trial witness if they had known the information in the email.

Based on the newly-disclosed email, the trial court held an evidentiary hearing on the *Brady* violation issue in 2021. Agent Fitzpatrick was too sick to travel and died shortly after the evidentiary hearing. Agent Marra, however, did testify.

Marra stated that in June of 2006, long before Connolly's trial, he met with Agent Fitzpatrick outside of a Boston courtroom. Agent Marra testified that he approached Fitzpatrick and said he was working on Connolly's prosecution in Florida. Agent Marra testified that he presented his business card and inquired about a letter Agent Fitzpatrick wrote about leaks in the FBI Boston office.

Agent Marra testified that, after this encounter outside the courtroom, he had a conversation with Agent Fitzpatrick over the phone. In that conversation, Agent Fitzpatrick said he did not think Connolly was responsible for the Callahan murder and did not believe State witnesses Stephen Flemmi and Kevin Weeks -- associates of the Winter Hill Gang -- were telling the truth. Agent Marra further testified that, the same day as the phone call, he emailed prosecutors Fred Wyshak and Michael Von Zamft to explain what Agent Fitzpatrick had said. The prosecution did not disclose this email to Petitioner before or during trial. They never called Agent Fitzpatrick to testify, despite his place on the State witness list.

21

Bruce Fleischer, trial counsel for Mr. Connolly, also testified at the evidentiary hearing on the post-conviction motion. Fleischer said that during the trial, he asked Agent Marra if the State intended to call Agent Fitzpatrick. Agent Marra told Mr. Fleischer that the State would not call him because "the man is mentally ill. He has got mental health issues."

Agent Marra never informed Mr. Fleischer that Agent Fitzpatrick said Mr. Connolly was not involved in this crime. Mr. Fleischer testified that he had never been given the Agent Marra email before or during trial. Had Mr. Fleischer seen that email, he said, he would have "further investigated the case on behalf of Mr. Connolly's defense." When asked what he would have done had the email been properly disclosed, Mr. Fleischer said, "[w]ell, we would have taken his the [sic] depo and/or made sure that he testified at trial, offered testimony."

Manny Casabielle, also counsel for Connolly at trial, testified that he did not receive the Agent Marra email either. While he said he decided not to call Agent Fitzpatrick because he could not trust what he was going to say, that decision was made *without* having seen the Agent Marra email. After seeing the exculpating email, however, Mr. Casabielle testified that had the State disclosed the email, he would have deposed Agent Fitzpatrick and further investigated evidence stemming from his testimony.

During the evidentiary hearing, the trial court expressed its frustrations with the State's failure to disclose the email. Specifically, the court stated, "I can't emphasize

enough how disturbed I am for the fact that **the decision [not to depose Fitzpatrick] was made in the absence of this email**." (emphasis added). The judge continued by stating that it was "truly astounding" that Agent Marra did not discuss his conversations with Agent Fitzpatrick in his deposition and that the conversation never came out, even though both prosecutors knew of it.

Nevertheless, despite these comments, the trial judge denied Connolly's Rule 3.850 motion because the *Brady* violation lacked materiality -- *i.e.*, there was no reasonable probability that the trial outcome would have been different had the information been timely disclosed.

The Third District Court of Appeal ("Third DCA") agreed on the materiality conclusion, *Connolly,* 366 So. 3d at 1150–52, which Petitioner contends was an incorrect and unreasonable determination.

### Additional, Significant Points From the Third DCA's Opinion

Given the deference which we must provide to the State appellate court (*see* legal standards section, below), it would be helpful to provide a summary of some of the more-salient points the Third DCA relied upon in affirming the ruling denying the post-conviction relief Connolly requested.

First, the Third DCA agreed with the State's contention that Fitzpatrick's affidaivit constitutes inadmissible hearsay (and therefore should not be factored into its analytical matrix) because he did not testify at the evidentiary hearing. Therefore, the appellate

court explained that it would be confining its review to whether the failure to disclose the statement Fitzpatrick made to Marra amounted to a *Brady* violation. *Connolly,* 366 So. 3d at 1149–50.

Second, the Third DCA explained that Marra's hearing testimony confirmed only that Fitzpatrick "merely communicated his conclusory *opinion* that Connolly was innocent." *Id.* at 1150. This, the appellate court highlighted, is only an "opinion, untethered to any evidentiary support" and has "been generally [] condemned as inadmissible." *Id.* (citing, among other authorities, *Martinez v. State*, 761 So. 2d 1074, 1079 (Fla. 2000) ("We begin our analysis with the basic proposition that a witness's opinion as to the guilt or innocence of the accused is not admissible.")).

Third, the appellate court pointed out that the statement, as confirmed within the email, "raises questions as to Connolly's culpability, satisfying the first element of *Brady.*" *Id.* Because neither the email nor the statement was disclosed by the State before trial, the court needed to examine materiality. *Id*.

Fourth, the Third DCA pointed out that the State's argument -- that no record evidence supported the trial judge's finding that prosecutors deliberately and intentionally withheld the e-mail -- is "persuasive." *Id.* It held that the critical inquiry is not the degree of intentionality of the act (because *Brady* "extends equally to both intentional and inadvertent suppressions"). *Id.*

24

Fifth, the appellate court was not impressed with the defense argument that a deposition or interview would have led to the discovery of Fitzpatrick's exculpatory statement. According to the appellate court's assessment, that argument is "little more than a backdoor conduit for the otherwise inadmissible affidavit, and it fails substantively on the record before us." *Id.*

Sixth, the appellate court noted that Marra was the sole witness to testify at the evidentiary hearing about Fitzpatrick's opinion, and he "did not deviate from the synopsis he provided to the prosecutors in the e-mail." *Id.* Moreover, the Third DCA highlighted that Connolly "offered nothing to corroborate the affidavit-based contention that Connolly was insulated from the Wheeler investigation" and that "any such claim is clearly refuted by a holistic review of the evidence." *Id.*

Seventh, the appellate court explained that the record is "littered with paperwork, including teletypes, memoranda, reports, and other internal documents" which demonstrate that "Connolly had access to the investigation and falsified documents to protect the informants and hinder the discovery of his own illegal acts." *Id.* at 1151.

Eighth, the Third DCA noted that the defense was, "at a minimum, constructively aware of the dates Connolly attended Harvard, the confidentiality safeguards implemented by the FBI, and the structure of the agency." *Id.* Therefore, as explained by the appellate court, "[t]his type of imputed knowledge has been held sufficient to defeat similar *Brady* claims." *Id.*

25

Ninth, to the extent the not-timely-produced e-mail "implicated Morris as an alternative culprit," the Third DCA explained, "the facts underlying this inference were universally known." *Id.* For example, Morris conceded he had superior control over the investigation due to his senior rank. He acknowledged he met with the informants on multiple occasions and admitted to having illegally accepted gifts and cash. He testified he was aware of the details of the Wheeler investigation, and he conceded he received immunity in exchange for cooperation. Given this testimony, the Third DCA held, "the information needed to develop the theory was available to the defense, and the e-mail offered nothing new." *Id.*

Tenth, the appellate court said the record is "replete with irreconcilably contradictory statements rendered by Fitzpatrick in the years leading up to his death." This evidence, the Third DCA explained, "fortifies the reliability concerns articulated by both Connolly and the State prior to trial and negates any natural expectation that Fitzpatrick would have corroborated the contents of his affidavit before it was executed." *Id.* at 1152.

Finally, the Third DCA's opinion ends with its emphasis on language from its *en banc* decision affirming the underlying conviction -- describing the evidence about Connolly's participation in Callahan's murder as "overwhelming." *Id.*

At bottom, the Third DCA engaged in a comprehensive, fact-intensive analysis of the circumstances underlying Connolly's state court habeas petition, including the *Brady-*

related claims he asserts here, and explained its ruling.

## III.    Applicable Legal Standards and Analysis

Relief pursuant to 28 U.S.C. § 2254 is available to correct only constitutional injury, not as an avenue for a federal court to opine on state court decisions regarding state law. *See* 28 U.S.C. § 2254; *see also Barclay v. Fla.*, 463 U.S. 939, 957–58 (1983) (holding that "mere errors of state law are not the concern of this court, unless they rise for some other reason to the level of a denial of rights protected by the United States Constitution"); *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (holding that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

A court's review of a state prisoner's federal habeas corpus petition is governed by the AEDPA. *See Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007). Under the AEDPA, there is "a critical difference between the question of whether to reverse for a claimed constitutional error on direct appeal and the question of whether to grant habeas relief after the state courts have rejected the claim of constitutional error." *Ferguson v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 1315, 1331 (11th Cir. 2013).

The AEDPA is intended to "guard against **extreme** malfunctions in the state criminal justice systems, and not as a means of error correction." *Ledford v. Warden, Ga. Diagnostic & Classification Prison*, 818 F.3d 600, 642 (11th Cir. 2016) (emphasis added). The AEDPA imposes a highly deferential standard, and "demands that state-court decisions be given the benefit of the doubt[.]" *Renico v. Lett*, 559 U.S. 766, 773 (2010).

On any claim adjudicated on its merits, a federal court may grant a habeas petition only if the state court's decision either: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court's decision is "contrary to" established Supreme Court precedent if it either applies a rule that contradicts the governing law set forth by the Supreme Court or confronts a set of facts materially indistinguishable from a decision of the Supreme Court but still results differently from the Supreme Court precedent. *Bell v. Cone*, 535 U.S. 685 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000) (O'Connor, J., concurring)).

A state court's decision involves an "unreasonable application of clearly established Federal law" if the state court correctly identifies the governing legal principle from the Supreme Court's decision but unreasonably applied that principle to the facts of the particular case. *Id*. This inquiry focuses on whether the state court decision is objectively unreasonable. *Id*.

An objectively "unreasonable application" is different from an incorrect application of federal law because "[t]he term 'unreasonable' in § 2254(d) is reserved for 'extreme malfunctions in the state's criminal justice system,' not for 'ordinary error' or even for cases 'where the petitioner offers a strong case for relief.'" *Samuel v. Carlin*, No.

2:20-CV-00545-REP, 2023 WL 3627647, at *3 (D. Idaho May 24, 2023) (quoting *Mays v. Hines*, 592 U.S. 385, 391 (2021) (*per curiam*)).

The standard for granting federal habeas relief is "difficult to meet." *Mays*, 592 U.S. at 391 (quoting *Harrington*, 562 U.S. at 102). Courts will not find the existence of an unreasonable application of federal law where "fairminded jurists could disagree" on the correctness of the state court's decision. *Harrington*, 562 U.S. at 101.

Concerning § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 571 U.S. 12 (2013). Thus, "if some fair-minded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied . . . . [T]he deference due is **heavy** and purposely presents a **daunting** hurdle for a habeas petitioner to clear." *Loggins v. Thomas*, 654 F.3d 1204, 1220 (11th Cir. 2011) (emphasis supplied).

Under § 2254(d), "when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion[,]" "a federal habeas court simply reviews the specific reasons given by the state court and **defers to those reasons if they are reasonable**." *Wilson v. Sellers*, 138 S. Ct. 1188 (2018). (emphasis added). Moreover, a state court's summary rejection of a claim, even without explanation, qualifies as an adjudication on the merits which warrants deference. *Ferguson v. Culliver*, 527 F.3d 1144, 1146 (11th Cir. 2008).

29

"Federal courts may grant habeas relief only when a state court blundered in a manner so 'well understood and comprehended in existing law' and 'was so lacking in justification' that 'there is no possibility fairminded jurists could disagree.'" *Tharpe v. Warden*, 834 F.3d 1323, 1338 (11th Cir. 2016) (quoting *Harrington*, 562 U.S. at 102–03). As noted above, this standard is "meant to be" a "difficult" one to meet. *Harrington*, 562 U.S. at 102.

In the instant case, the state court (the Third DCA) adjudicated the claim on the merits and explained its decision in a reasoned ruling. This decision, as we will discuss now, is therefore entitled to deference by this Court.[8]

### Did The Third DCA's Opinion Involve an Unreasonable Application of Brady?

Petitioner's state court motion and his Petition here rely on Fitzpatrick's December 3, 2013 affidavit. During a January 17, 2018 hearing to determine if Connolly would be entitled to an evidentiary hearing, the State disclosed the existence of Marra's July 6, 2006 pre-trial email to a state and federal prosecutor. The email was then provided to the state court trial judge and defense counsel.

The trial court found that the State's failure to disclose the email before trial appeared to have been deliberate and intentional but denied the claim because the email

---

[8]     Respondent concedes that Petitioner has met both the "in custody," timeliness, and exhaustion of state remedies requirements, so there is no need for the Undersigned to discuss these non-issues here.

lacked materiality (*i.e.*, there was no reasonable probability that the trial outcome would have been different if it had been disclosed).

Petitioner argued that Marra's 2006 email about his conversation with Fitzpatrick contains exculpatory evidence which was withheld by the State. Accordingly, it is the **email**, and not the *affidavit*, which was the focus of the appellate court's *Brady* analysis.

The appellate court's opinion stated that Fitzpatrick's affidavit was inadmissible hearsay. Therefore, the Third DCA limited its review to whether the failure to disclose Fitzpatrick's statement to Marra violated *Brady*. Because Fitzpatrick did not testify at the evidentiary hearing and his testimony was not perpetuated in any way, Marra's email (purportedly memorializing the statement Fitzpatrick supposedly made to him in a telephone conversation) and Marra's testimony at the hearing were the only evidence about Fitzpatrick's alleged statement. *Connolly,* 366 So. 3d at 1150.[9]

Both the trial and appellate courts ruled *for* Petitioner on the first two prongs of the *Brady* requirements, concluding he met those elements.[10] Our focus will therefore be

---

[9]     Subclaim II of the federal Petition being evaluated here alleges that the State appellate court made an unreasonable determination of the facts by improperly focusing on the admissibility of Fitzpatrick's affidavit. Thus, Petitioner argues that he is entitled to relief under section 2254(d)(2). But it is the email *alone* which was the subject of the appellate court's materiality analysis. Moreover, the affidavit is clearly inadmissible hearsay. Petitioner has not presented any persuasive argument to the contrary.

[10]     In order to establish a *Brady* violation, Petitioner has the burden to establish **all** three of the following requirements: (1) the evidence in question was favorable to the defendant, either because it is exculpatory or impeaching; (2) the prosecution possessed

on **materiality**, the third factor (for which the state court ruled against Connolly).

To establish materiality, Petitioner must demonstrate "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A 'reasonable probability' of a different result" is one in which the suppressed evidence "'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678).

However, "[t]he mere *possibility* that an item of undisclosed information **might** have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109–10, (1976) (emphasis added).

So, did Petitioner meet his burden to show that the untimely production of the email was material?

Answering that critical question requires the Undersigned to evaluate the withheld evidence "in the context of the entire record." *Agurs*, 427 U.S. at 112.

According to the State,[11] the record demonstrates that it provided materials to the

---

and withheld that evidence, either willfully or inadvertently; and (3) the suppression prejudiced the petitioner. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

[11]     Technically, Ricky D. Dixon, the Secretary of Florida's Department of Corrections, is the sole Respondent. But his position is that of the State, and his defense here is being handled by an Assistant State Attorney General. Thus, for all practical purposes, the *State*

defense during pre-trial discovery, which were also introduced at the evidentiary hearing, demonstrating (per the Third DCA's analysis) that Petitioner "had access to the investigation and falsified documents" to "hinder the discovery of his own illegal acts." [ECF No. 37, p. 32]; *Connolly*, 366 So. 3d at 1151.

At bottom, Petitioner's core argument on materiality is that if the email had been produced before trial, then his lawyers would have taken Fitzpatrick's deposition (or interviewed him), which, in turn, would have demonstrated that he did not have access to the investigation and therefore could not have provided the "tip."

The difficulty with this argument, however, is that it overlooks the all-important fact that *both* sides were leery about calling Fitzpatrick as a trial witness. The proof of that collective attitude is reflected by the fact that neither the defense, Florida prosecutors, or United States prosecutors arranged for Fitzpatrick to testify at Petitioner's federal and state trials.

Significantly, the State contends that Petitioner's lead defense counsel, Manuel Casabielle, was a **State** witness at the evidentiary hearing and testified that Petitioner clearly viewed Fitzpatrick as an unreliable witness. (Ex. KKK, App. pp. 2011–15, DE 22-10: 322–26; App. pp. 2020–23, DE 22-10: 331–34; App. pp. 2031–33, DE 22-10: 342-344; and App. pp. 2036–37, DE 22-10: 347–48).

---

is the party interested in the outcome of this habeas petition. Accordingly, the Undersigned will sometimes refer to Respondent as "the State."

According to the State, Casabielle also testified that Fitzpatrick's pre-trial statements about Petitioner on the "60 Minutes" news feature show would make Fitzpatrick a dangerous witness for the defense. (Ex. KKK, App. pp. 2018–9, DE 22-10); (Ex. LLL, App. pp. 2269–93, DE 22-10: 580–604).[12]

For example, although Fitzpatrick was once a high-ranking supervisor in the Boston office of the FBI, he was demoted in 1986 because he falsified FBI documents and resigned soon after. (EX. KKK, App. pp. 1906–09, DE 22-10: 217–20); (Ex. LLL, State Ex. 2, App. pp. 2113–16, DE 22-10: 424–27). His credibility would also have been impeached by the "60 Minutes" excerpts set forth in Ex. LLL. (State Exhibit 18, App. pp. 2269–93, DE 22-10: 580–604).

Petitioner describes Fitzpatrick as an "unbiased law enforcement officer" who would have been the "only credible, unbiased witness to testify" at the trial. [ECF No. 1, p. 19]. But this perspective is flatly inconsistent with the fact that no attorney for either side arranged for Fitzpatrick to testify at Petitioner's trial in federal court or in Florida state court. All concluded that he would be an unreliable witness. In fact, as noted above, Casabielle viewed him as a dangerous witness for Petitioner.

Petitioner's argument that the email was material is refuted by the record evidence that United States District Judge Mark L. Wolf issued an extensive opinion where he

---

[12]     The State advises that Fitzpatrick's "60 Minutes" interview was in 2001, before Petitioner's state court trial. [ECF No. 21, p. 33].

found that Fitzpatrick had falsely claimed in an FBI document to have interviewed Bulger concerning the Wheeler and Callahan murders, and that Bulger had denied being involved. *United States. v. Salemme*, 91 F. Supp. 2d 141, 211, 323 (D. Mass 1999), *rev. in part sub nom, on other grounds*, *United States v. Flemmi*, 225 F.3d 78 (1st Cir. 2000) (ruling reversed because, in a question of first impression in the circuit, the First Circuit panel held that FBI agents, acting independently, do not have authority to confer use immunity on a confidential informant).

Furthermore (and as noted above), although Fitzpatrick was once a high-ranking supervisor in the Boston office of the FBI, he was demoted in 1986 because he falsified FBI documents and resigned soon after. (Ex. KKK, App. pp. 1906–09, DE 22-10: 217–20); (Ex. LLL, App. pp. 2113–16, DE 22-10: 424–27). His credibility would also have been easily and significantly impeached by the "60 Minutes" excerpts set forth in Ex. LLL (App. pp. 2269–93, DE 22-10: 580–604).

By way of example, at page 13 of the transcript from the interview, Fitzpatrick stated "[f]irst of all, Connolly became the informant for Bulger, and in effect, Bulger is now inside the kingdom if you will. He now has the keys to the FBI vault, the FBI kingdom. Bulger can get any information he wants through Connolly, and, as we know now, did. That to me is shocking." (Ex. LLL, App. 2283–84, DE 22-10: 594–95).

Additionally, Fitzpatrick is quoted in "The Boston Herald" on April 11, 2001, as saying "[i]nnocent people were killed, murdered, and I hold agents responsible for that." Chiefly responsible, Fitzpatrick said, were John Morris and John Connolly, but Fitzpatrick held the harshest judgment for Connolly -- who he said turned the traditional FBI informant relationship on its head. "Connolly turned out to be an informant" "when everybody was asleep, this guy (Connolly) went down and grabbed all this stuff and gave it out, anything Bulger needed, the information about criminal competitors, information about others ratting him out, information about other law enforcement agencies." (Ex. LLL, App. pp. 2298, DE 22-10: 609).

Furthermore, an article in "The Boston Herald" which ran on April 17, 1998, reported on Fitzpatrick's testimony in federal court that Petitioner was suspected of rifling files in a murder investigation in which co-defendant/informant Bulger was a suspect, and passing information on to Bulger. Petitioner responded by calling Fitzpatrick's allegations "unmitigated nonsense." (Ex. LLL, App. pp. 2119-2120, DE 22-10: 430–31). On the same day, another article about Fitzpatrick's testimony appeared in "The Boston Globe." The article quoted Connolly as describing Fitzpatrick's testimony as "ludicrous." (Ex. LLL, App. pp. 2123–24, DE 22-10: 435–36).

The record clearly indicates that Petitioner made comments which criticized Fitzpatrick (which were quoted in two newspaper articles). He also informed his lead defense counsel, Mr. Casabielle, that he considered Fitzpatrick to be an undesirable

witness. Yet Petitioner now claims that a man with a checkered reputation, who Petitioner previously held in such low regard, would have been a credible witness and that there is a reasonable probability that Fitzpatrick would have changed the outcome of Petitioner's trial by virtue of a sole, unsubstantiated opinion.

We're not persuaded.

Petitioner is focusing on Fitzpatrick's single, unsubstantiated exculpatory statement in the email that "Fitzpatrick also stated that it was his personal opinion that John Connolly was not responsible for the Halloran and Callahan murders." The value of this single *opinion* is highly inflated, especially when considered in context of the many other statements which Fitzpatrick made regarding Petitioner's guilt, which were addressed and admitted as State exhibits during the January 13, 2021, evidentiary hearing. Furthermore, evidence that Fitzpatrick was told that Petitioner was rifling files (which caused concern that he would be leaking information to his informants) further undermines Fitzpatrick's potential value as a trial witness for Petitioner.

Fitzpatrick's lack of credibility was established by: (1) record evidence that Fitzpatrick was demoted for falsifying FBI documents; and (2) a federal District Court Judge's extensive written opinion where he found that Fitzpatrick made false claims in an FBI document. Given this reality, it is highly unreasonable for Petitioner to argue that the subject isolated *opinion* of Petitioner's innocence would have demonstrated a reasonable probability that the result of the proceeding would have been different.

As reflected by the points outlined above, Fitzpatrick would not have been a more-reliable trial witness than Flemmi and Martorano merely because he was an FBI agent and Petitioner's supervisor.

After all, Fitzpatrick's reputation was clearly tarnished by the record evidence of his falsifying documents in the course of his job and when testifying before a federal court.

It is illogical to characterize Fitzpatrick as a highly-valuable, model witness. He acknowledged that he had no information either way about whether Petitioner did (or did not) reveal FBI informant identities to Bulger or Flemmi and that he never heard that Petitioner was leaking information when he was his supervisor. Fitzpatrick's testimony would not have trumped that of Flemmi, Martorano, and Morris, who *did* have knowledge of the leaks. And it would not have carried more weight than the documentary evidence that Petitioner was aware of the ongoing murder investigations, was rifling the files of those agents on the investigation, and took steps to protect the informants and himself.

As explained by the state appellate court, "the defense offered nothing to corroborate the affidavit-based contention that Connolly was insulated from the Wheeler investigation. And any such claim is clearly refuted by a holistic review of the evidence." *Connolly*, 366 So. 3d at 1150.

Although Petitioner challenges the conclusion that he had access to the investigation, the Third DCA's fact-based analysis is that "the record is littered with paperwork, including teletypes, memoranda, reports, and other internal documents" demonstrating that Petitioner did in fact have that access and "falsified documents to protect the informants and hinder the discovery of his own illegal acts." *Id.* at 1150–51. The Undersigned is nowhere near convinced that this fact-oriented evaluation was unreasonable.

At bottom, Petitioner did not meet his burden to show that there was a reasonable probability that, had the email been disclosed to the defense before trial, the outcome of the proceeding would have been different. Instead, Petitioner has established nothing more than the "mere possibility" that the undisclosed e-mail "might" have affected the outcome of the trial. Such a mere possibility does not establish materiality. *Agurs*, 427 U.S. at 109–10. Thus, the appellate court properly affirmed the trial court's finding as to a lack of materiality. Accordingly, there was no *Brady* violation (as materiality has not been established).

As illustrated above, the last state court to decide the claim explained its decision on the merits in a reasoned opinion. Upon review, it is clear that the reasons given by the state court are reasonable. Thus, they are entitled to *deference* by this Court. *Wilson*, 138 S. Ct. at 1192. The state appellate court's decision did not involve an unreasonable application of *Brady* and Petitioner did not meet his burden to show that there was a

reasonable probability that, had the e-mail been disclosed before trial, the outcome of the proceeding would have been different. Thus, Petitioner is not entitled to federal habeas corpus relief on this aspect of his claim. *Williams*, 529 U.S. at 405–06.

### Did the Third DCA Base Its Opinion on An Unreasonable Determination of the Facts in Light of Evidence Presented in the State Court Proceeding?

The Petitioner's second argument is that the Third DCA unreasonably determined the facts by improperly focusing on the admissibility of Fitzpatrick's affidavit. If adopted, then the arguments would provide relief authorized by Section 2254(d)(2).

But Petitioner's argument is not a well-taken one. The appellate court's opinion focused on the email when assessing whether Petitioner established materiality. Indeed, the opinion expressly pointed out that the affidavit was inadmissible hearsay and therefore would not factor into the materiality analysis. The appellate court limited its review to "whether the failure to disclose the statement Fitzpatrick made to Marra amounted to a violation under *Brady* and its progeny." *Connolly*, 366 So. 3d at 1149.

For all practical purposes, Petitioner's argument addressed the contents of the affidavit because he says that if his defense team had known about the email, then it would have interviewed Fitzpatrick or taken his deposition -- and that would ultimately have led to Fitzpatrick providing the details in the affidavit.

But the affidavit is pure hearsay and was inadmissible, as the appellate court explained by its citation to case law authority: "*See Williamson v. State*, 961 So. 2d 229, 234–35 (Fla. 2007) (finding that affidavit of declarant unavailable to testify constituted

inadmissible hearsay in post-conviction evidentiary hearing); *Randolph v. State*, 853 So. 2d 1051, 1062 (Fla. 2003) (affirming exclusion of affidavit by a witness who died before post-conviction evidentiary hearing)." *Id.* at 1150.

Petitioner has not established that the state appellate court unreasonably determined the facts in light of the evidence presented in the state court proceedings. To the contrary, the reasons provided by the state court are reasonable, and are therefore entitled to deference.

Moreover, as discussed above, this argument still does not enable Petitioner to clear the materiality hurdle.

### Did the Third DCA Unreasonably Apply *Brady?*

Petitioner alleges that the state court erroneously concluded that he had equal access to the suppressed evidence and unreasonably conflated the *Brady* violation prongs because the court cited to cases for the proposition that the suppressed evidence was not material or prejudicial since it was available to defense counsel.

Petitioner alleges that the opinion erroneously concluded that he had equal access to the information in the email, and therefore the not-timely-disclosed email offered nothing new.

Petitioner again argues that if the email had been disclosed prior to trial, then he and his legal team would have interviewed Fitzpatrick (or taken his deposition) and ultimately would have obtained information similar to that contained in the affidavit. But

the affidavit was not admitted at the evidentiary hearing and the defense did not offer any evidence to corroborate the affidavit's theory that Petitioner was insulated from the Wheeler investigation because he was attending classes at Harvard.

Furthermore, the state appellate court opinion noted that this defense theory was refuted by the record in the form of various FBI reports and documents which indicated that Petitioner did in fact have access to the investigation and falsified documents to protect the informants and attempt to prevent the discovery of his own illegal acts. It was in this context that the opinion stated that the defense was "constructively aware of the dates Petitioner attended Harvard." *Id.* at 1151.

The fact that the opinion then cited to cases that such constructive knowledge would defeat a *Brady* claim had no bearing on the court's ultimate conclusion that there was no *Brady* violation based on Petitioner's failure to establish the materiality prong, as explained in the first argument analysis, above.

As to the opinion's language that "the e-mail offered nothing new," the statement was made in the context of Petitioner's argument that the e-mail implicated Morris as an alternative culprit. *Id*. This was an accurate statement, as it was clearly known to the defense that Morris was complicit.

Significantly, this language does not negate the fact that the appellate court conducted a proper materiality analysis and found that, based on the record evidence, Petitioner failed to demonstrate a reasonable probability that had the evidence been

disclosed, the result of the proceeding would have been different. *Id.* at 1151–52.

Lastly, Petitioner argues that the state appellate court's opinion unreasonably *conflated* the prongs of *Brady*. As explained above, the language did in fact **negate** materiality. Negating a required section of a legal test is not the same as conflating the multiple elements of the required analysis.

By way of summary, the last state court to decide the claim explained its decision on the merits in a reasoned opinion. Upon review, it is clear that the reasons given by the state court are reasonable and are entitled to deference by this Court. *Wilson*, 138 S. Ct. at 1192. Petitioner did not meet his burden to show that there was a reasonable probability that, had the e-mail been disclosed before trial, the outcome of the proceeding would have been different. The state appellate court's decision was not contrary to, or an unreasonable application of *Brady*. Thus, Petitioner is not entitled to federal habeas corpus relief on this claim. *Williams*, 529 U.S. at 405–06.

## IV.     Conclusion

The Undersigned **respectfully recommends** that Judge Williams **deny** the Petition.

## V.     Recommendation to Deny Certificate of Appealability

Under the AEDPA, before a petitioner may appeal the denial of a § 2254 habeas corpus petition, the petitioner must obtain a certificate of appealability. "Section 2253(c) bars appeals from 'final order[s]' in [habeas] proceedings '[u]nless a circuit justice or

judge issues a certificate of appealability.'" *Jackson v. United States*, 875 F.3d 1089, 1090 (11th Cir. 2017) (quoting 28 U.S.C. § 2253(c)(2)). Section 2253(c) permits the issuance of a certificate of appealability only where a petitioner has made a "substantial showing of the denial of a constitutional right." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal citation omitted). And this requires the petitioner to, in turn, show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Id.* (internal quotations omitted).

In this case, the Undersigned finds that a certificate of appealability is not appropriate and therefore recommends that Judge Williams not issue one. The evidence against Petitioner was overwhelming and he has not cleared the substantial hurdles erected by the AEDPA.

Thus, by way of summary conclusion, the Undersigned **respectfully recommends** that the Court **deny** Connolly's Petition and **not** issue a certificate of appealability.

## VI.   Objections

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with United States District Judge Kathleen M. Williams. Each party may file a response to the other party's objection within fourteen (14) days of the objection. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue

covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, Miami, Florida, on September 27, 2024.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

<u>**Copies furnished to**</u>:
The Honorable Kathleen M. Williams
All Counsel of Record